**EFiled: Jan 31 2017 01:32PM EST**
**Transaction ID 60140944**
**Case No. 10513-VCL**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN A. DORE, MICHAEL J. O'ROURKE, AND MICHAEL C. MOODY, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 10513-VCL |
| SWEPORTS, LTD., | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: November 15, 2016
Date Decided: January 31, 2017

Bruce E. Jameson, John G. Day, PRICKETT, JONES & ELLIOT, P.A., Wilmington, Delaware; Robert E. Williams, O'ROURKE & MOODY, Chicago, IL; *Counsel for John A. Dore, Michael J. O'Rourke, and Michael C. Moody*.

Paul D. Brown, Joseph B. Cicero, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; Anthony S. Divincenzo, Robert W. Queeney, DIVINCENZO SCHOENFIELD AND SWARTZMAN, Chicago, Illinois; *Counsel for Sweports, Ltd.*

**LASTER, Vice Chancellor.**

Plaintiffs John Dore, Michael O'Rourke, and Michael Moody seek indemnification from defendant Sweports Ltd. for expenses[1] incurred in three proceedings that took place in Illinois. This post-trial decision awards them $241,492.50 for the Illinois proceedings, plus 20% of the expenses they incurred enforcing their indemnification right through this proceeding.

## I.      FACTUAL BACKGROUND

Trial took place on March 16–17, 2016. The parties submitted over two hundred exhibits. Each of the plaintiffs testified live. The parties relied as well on the deposition testimony of the plaintiffs and four non-parties: George Clarke, who was a central figure in the underlying dispute; Andrew G. Chenelle, who participated with the plaintiffs in one of the transactions that led to the underlying dispute; Thomas Courtney, who served as an expert witness in the Illinois litigation; and Robert Queeney, an attorney for Sweports in

---

[1] Section 145 of the Delaware General Corporation Law (the "DGCL") uses "expenses" as a broad concept that includes both attorneys' fees and amounts paid out of pocket that might be referred to more traditionally and colloquially as expenses. *See, e.g.*, 8 *Del. C.* § 145(a) (authorizing a corporation in a proceeding other than one brought by or in the right of the corporation to provide indemnification "against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred"); *id.* § 145(b) (authorizing a corporation in a proceeding brought by or in the right of the corporation to provide indemnification "against expenses including attorneys' fees) actually and reasonably incurred"); *id.* § 145(c) (mandating corporation to indemnify a director or officer who was successful on the merits or otherwise in defending a proceeding "against expenses (including attorneys' fees) actually and reasonably incurred").  The out-of-pocket expenses encompassed by Section 145 are broader than the restricted concept of "costs" in the statute that authorizes the recovery of court costs in the Court of Chancery. *See* 10 *Del. C.* § 5106; *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 686–88 (Del. 2013). This decision uses the term "expenses" as it appears in Section 145.

1

the Illinois litigation who served as forwarding counsel in this case. The following facts were proven by a preponderance of the evidence.

**A.    Sweports**

Sweports is a Delaware corporation with its principal office located in Skokie, Illinois. It is a holding company that owns intellectual property rights for cleaning products and a majority interest in UMF Corporation, an Illinois corporation. PTO ¶ 1.

The businesses and internal affairs of Sweports and UMF are inextricably linked. UMF uses technology licensed from Sweports to manufacture anti-microbial cleaning products that are sold primarily in the healthcare and hospitality industries. Sweports also engages in capital-raising activities and provides funding for UMF.

Clarke founded both Sweports and UMF. He is the majority stockholder and chief executive officer of Sweports, as well as a member of its board. Through these roles, Clarke controls Sweports. Through his control over Sweports, Clarke controls UMF. He also serves as UMF's chief executive officer and as a member of its board.

**B.    The Initial Sandbox Deal**

In 2005, UMF needed capital. Clarke contacted Sandbox Industries, LLC, a venture capital firm. In November 2005, Sandbox agreed to provide UMF with strategic, financial, and managerial consulting services in return for warrants to purchase approximately 30% of UMF's equity. *See* JX 139 at 1.

One of Sandbox's specific tasks was to help UMF raise up to $1 million in financing. Sandbox proved unable or unwilling to locate external financing for UMF. Instead, between December 9, 2005, and February 20, 2006, Sandbox loaned $1.7 million to UMF

2

(the "Sandbox Loan"). The consideration for the Sandbox Loan included warrants to purchase an additional 17.2% of the equity in UMF. Sandbox also received the right to designate a member of the UMF board and the right to obtain board control in the event of default by expanding the board and filling the resulting vacancies. *Id.* at 1-2; JX 107 at 1.

Joseph Feldman, a managing member of Sandbox, joined the UMF board. JX 139 at 2. At that time, the UMF board comprised Clarke, Feldman, and Barry White.

## C.    Sandbox Introduces Clarke To The Law Firm.

In July 2006, Clarke and Sandbox began discussing further investments by Sandbox. The discussions progressed sufficiently that Clarke needed counsel to render a tax opinion. Nick Rosa, a principal at Sandbox, suggested O'Rourke, a Chicago lawyer. Rosa was O'Rourke's "good friend and client." Tr. 141 (O'Rourke). Rosa reached out to O'Rourke and asked him to work with Clarke. *Id.*

Sweports formally retained O'Rourke Katten & Moody LLP[2] pursuant to an engagement letter dated July 12, 2006. *See* JX 93. Sweports also retained John Perkaus of the law firm of Perkaus & Farley, whom O'Rourke brought in to provide additional transactional expertise. *Id.* O'Rourke added his partner, Moody, to the engagement because Moody had the expertise to render a tax opinion. *See* JX 93; Tr. 27 (Moody).

---

[2] The firm is currently known as O'Rourke & Moody LLP. The parties refer to it by a confusing mélange of monikers, including its former name, its current name, and the acronyms "OKM" and "OM." This decision calls it the "Law Firm."

3

**D.      Clarke Ends The Sandbox Relationship.**

In September 2006, the negotiations over the Sandbox investment reached an impasse. Sandbox upped the ante by claiming that UMF had defaulted on the Sandbox Loan. Sandbox notified UMF that it was exercising its right to appoint a majority of the UMF board. If successful, Sandbox would have gained control over UMF. JX 139.

Clarke enlisted the Law Firm to defend against the takeover attempt. In early November 2006, the Law Firm negotiated a settlement with Sandbox. JX 108.

The settlement called for UMF to pay Sandbox the amounts due under the Sandbox Loan and to buy out Sandbox's equity interest in UMF. *See* Tr. 30 (Moody); Tr. 144-45 (O'Rourke). The terms contemplated UMF making three significant cash payments to Sandbox between November 2006 and May 2007. The parties appear to have agreed that Feldman would remain on the UMF board until the separation was complete.

**E.      The Law Firm Becomes Enmeshed With Its Client.**

UMF needed capital to fund the settlement. Clarke hoped to obtain a credit line of $1.2 million. O'Rourke and Moody told Clarke that they could raise the funds he needed because they had wealthy friends and a relationship with American Chartered Bank (the "Bank"), which was a client of the Law Firm.

The Bank declined to provide non-recourse financing to Sweports or UMF. The Bank agreed to extend a loan to Sweports if individuals of means guaranteed it. O'Rourke and Moody therefore structured a financing transaction in which (i) the Bank loaned $500,000 to Sweports (the "Bank Loan") and (ii) the plaintiffs and non-parties Chenelle and Lee Abrams guaranteed the loan. Tr. 145 (O'Rourke); Clarke Dep. at 54; JX 97.

4

Sweports and the guarantors memorialized their part of the financing transaction in two poorly drafted documents. One of the documents was a promissory note. JX 5.0022 (the "Note"). In it, Sweports committed to repay the Bank Loan and to treat any amounts that the guarantors had to pay the Bank as amounts due under the Note.

The other document was a Loan Guaranty and Stock Purchase Agreement. JX 97 (the "Guarantee Agreement"). It provided the guarantors with consideration for guaranteeing the Bank Loan. Each guarantor received a 2% equity interest in Sweports from Clarke, plus an option to buy an additional 1% equity interest from Sweports for $100,000. Each guarantor also received a preemptive right, styled as an option, to acquire a proportionate share of any additional equity that Sweports issued "for a period of 2 years on the same terms offered to any other person or entity." *Id.* at 2. The preemptive right protected the guarantors against dilution.

O'Rourke and Moody also raised money from other investors. In total, they raised approximately $1.3 million for Sweports. UMF received over $1 million of the proceeds in the form of a loan from Sweports.

In December 2006, each of the plaintiffs exercised the option to acquire another 1% of Sweports stock, raising their combined ownership stake to 9%. By this time, Sweports owed the Law Firm a substantial sum. Pursuant to an agreement dated December 31, 2006, Sweports and the Law Firm agreed to convert $107,500 of its outstanding receivable into 1.25% of Sweports equity. JX 113; Tr. 56 (Moody). The Law Firm received the same two-year preemptive right to protect itself against dilution.

During this period, Clarke added O'Rourke and Dore to the Sweports board, and Dore served as Sweports' Chief Operating Officer. They began acting in these capacities in November 2006. *See* Tr. 8 (Dore). Clarke did not formally appoint O'Rourke and Dore to their new positions until December 26, 2006, when he did so by written consent. JX 112.

The Law Firm drafted the written consent that Clarke executed. In addition to the appointments, the consent adopted a set of amended and restated bylaws for Sweports. JX 112 (the "Amended Bylaws"). The Amended Bylaws introduced a number of new provisions, including the following:

- Article II, Section 9(c) added a supermajority voting provision that required the affirmative vote of not less than 75% of all outstanding shares entitled to vote for a list of actions that included "the removal from office of a duly elected and qualified Director prior to the expiration of his term." JX 112 at 3. At the time, Clarke owned 73% of Sweports equity. *See* JX 8 at 10.

- Article IV, Section 3 provided that "[a]ny officer may be removed only for cause," defined narrowly as the conviction of a felony, a crime involving dishonesty or theft, reckless or intentional misconduct, or breach of fiduciary duty. JX 112 at 7.

- Article VII added mandatory indemnification rights "to the full extent permitted by the Delaware General Corporation Law" for any person "who at any time is or was a director, officer, employee, or agent." *Id.* at 13-14. This is the provision at issue in this litigation.

There is reason to believe that when Clarke executed the written consent that adopted the Amended Bylaws, he did not perceive the importance of these provisions. He instead trusted his lawyers and their representation that the changes made by the Amended Bylaws were non-substantive clean-up items. *See* JX 8 at 33-34; JX 139 at 2, 8-9.

### F. Another Potential Sandbox Deal

Shortly after O'Rourke and Dore began functioning as directors of Sweports, O'Rourke started discussing a new deal with Sandbox. The concept involved forming an entity to market consumer products that used Sweports' technology. Sandbox would fund the entity and receive in return a supermajority of its equity (the initial proposal was 85%; it ended up at 80%). Sweports would contribute its technology, and UMF would contribute its operating assets. They would receive in return a minority stake (the initial proposal was 15%; it ended up at 20%). Sandbox and O'Rourke hoped to prevent Clarke from having any involvement in the post-transaction entity. They discussed "that a deal won't happen if George [Clarke] is involved." JX 110.

On January 8, 2007, the Sweports board held a regular meeting. The members at the time were Clarke, O'Rourke, and Dore. The minutes recite that the directors, including Clarke, "unanimously agree[d] to consider and evaluate a joint venture with Sandbox for exploitation of the consumer market." JX 114. At the time, Clarke does not appear to have known important details such as the plan to cut him out of the new venture or the fact that the entities he controlled (Sweports and UMF) would own a minority stake.

At the same meeting, the directors caused Sweports to add Dore to the UMF board. Dore filled a vacancy created by the death of White, who had been a member of the board. As a result, the members of the UMF board were Clarke, Dore, and Feldman.

After the meeting, O'Rourke moved forward with new Sandbox deal. Moody handled the negotiations with Sandbox, performed the legal work, and began drafting the implementing documents. Tr. 37 (Moody).

During a meeting of the Sweports board on February 20, 2007, Dore suggested that O'Rourke replace him on the UMF board. O'Rourke and Dore voted to cause Sweports to act by written consent to appoint O'Rourke to the UMF board. Clarke abstained. Dore subsequently executed a written consent on behalf of Sweports. JX 116.

Clarke had to leave halfway through the February 20 meeting. After his departure, O'Rourke and Dore resolved that Dore, O'Rourke, Moody, and two other individuals would loan Sweports a total of $125,000, "secured by the intellectual property and other assets of the Company" and "convertible into common stock of the Company at an agreed upon conversion rate." JX 115 at 3; *cf.* JX 117. They also doubled Dore's salary to $100,000 a year, something Clarke opposed, and made the increase retroactive to February 1. *Compare* JX 115 at 4 *with* JX 139 at 10.

## G.    The Schism Between Clarke And The Law Firm

After the meeting of the Sweports board on February 20, 2007, Clarke became suspicious. He seems to have gotten the sense that the plaintiffs were plotting with Sandbox against him. Matters came to a head in early March, when Moody and Sandbox reached agreement on the terms of the Sandbox deal. Clarke viewed it as "a takeover of UMF and Sweports by Sandbox." Clarke Interrog. at 4. The record supports his view. *See* JX 118.

O'Rourke tried to schedule a joint meeting of the Sweports and the UMF boards to approve the Sandbox deal. He noticed a meeting for March 12, 2007, but Clarke refused to attend. Clarke said he was exploring a competing opportunity with a German company and expected to hear back on March 14. *See* JX 121; Tr. 151 (O'Rourke).

8

O'Rourke did not want to wait. He emailed Dore, Moody, and Perkaus that Clarke had "gone postal." JX 124. Perkaus responded:

Guys –

He [Clarke] doesn't have the power to cancel the meetings[.] I suggest we move forward on Tuesday as planned[.]

From now on no more email[.] I'll call later.

*Id.*

O'Rourke re-noticed meetings of the Sweports and UMF boards for Tuesday, March 20, 2007. Clarke tried to cancel the meetings, but O'Rourke, Dore, and Feldman told him they were going forward. During the Sweports meeting, O'Rourke and Dore voted in favor of the Sandbox deal. Clarke voted against. During the UMF meeting, O'Rourke and Feldman voted in favor of the Sandbox deal. Clarke voted against. The UMF board also made O'Rourke general counsel of UMF.

Promptly after the meetings, Clarke wrote a letter in which he raised numerous objections to the Sandbox deal and to O'Rourke serving as general counsel for UMF. O'Rourke responded with an email in which he berated and belittled Clarke:

Mr. Clarke--With respect to your letter and your restated objections to the actions of the UMF and Sweports Board [sic] on March 20, 2007, including my appointment as general counsel (by the way, the correct spelling for counsel is "counsel" not "council" which means an appointed group or tribunal, the lesson being if you intend to make a strong statement, it would behoove you to know how to spell), I have nothing but astonishment and disappointment in the childish and self-centered way you have behaved. To say you have behaved like a spoiled brat would be an unfair slap to the spoiled brats of this world. Try growing up. As for our actions, the actions we have taken have been entirely lawful. They have been entirely prudent. They been taken in the best interests of the companies. They have reflected the financial realities of those companies, in contrast to your habit

9

of dealing with our financial realities by setting off on another one your fantasy flights into Never Never [sic] land. Your objections are nonsensical. Thus, I can assure you that wherever you are, the Boards of these companies will continue to press forward to direct these companies in a professional and businesslike fashion. I can also assure you that wherever you are the Boards of Sweports and UMF will continue to work to put these companies on a sound financial footing. Finally[,] I can assure you that wherever you are, the Boards of these companies will not wait to deal with your obstructionism. Wherever you are, we are going to deal with you now.

JX 130.

On March 26, 2007, Clarke refused to sign letters announcing the Sandbox deal. In response, O'Rourke noticed a special meeting of the UMF board for April 2, 2007. The agenda included a discussion of the "performance of George Clarke as chief executive officer." JX 132. Clarke believed that O'Rourke and Feldman were going to fire him at the meeting.

## H.    Clarke Retakes Control.

Before the board meeting could take place, Clarke reasserted control over Sweports and UMF. He executed and circulated a document titled "Informal Action in Lieu of a Special Meeting of the Shareholders of UMF Corporation." JX 136 (the "UMF Informal Action"). It is not precisely clear when the UMF Informal Action was prepared, executed, or circulated. The definitive version is dated April 5, 2007, but the record suggests that Clarke signed an earlier version on March 30 and circulated it by email on March 31. *See* JX 133; JX 139 at 13.

In the UMF Informal Action, Clark acted in his capacities as CEO and Chairman of the Board of Sweports to cause Sweports to vote its shares of UMF stock in favor of the following actions at UMF:

10

- A declaration that O'Rourke never had been validly appointed as a director of UMF;

- A declaration that because O'Rourke had never validly been appointed as a director, the approval of the Sandbox deal by a vote of 2-1 was invalid and ineffective; and

- The removal of Feldman as a director of UMF.

JX 136 at 3-4.

The UMF Informal Action also contained recitals and resolutions directed at the Law Firm. It stated:

- "[T]he Law Firm has also provided legal services and advice to Sweports concerning *inter alia*, the Alleged Sandbox Deal, the appointment of Michael J. O'Rourke and John A. Dore to the Sweports' Board of Directors, the Sweports Corporation's By-laws, and the provisions of Sweport's stock purchase agreements to the principals of the Law Firm . . . and . . . to the Law Firm."

- "[T]he Law Firm has demanded payment for alleged legal services . . . that were negligently performed, not performed in the best interests of [UMF] or its shareholders, and in breach of the Law Firm's fiduciary duties to the corporation and its shareholders."

- "None of the monies sought by the Law Firm from [UMF] are in fact owed, due or payable, and upon information and belief, the Law Firm is in material part responsible for damages due to the Corporation from its acts and omissions, including without limitation, damage from the Alleged Sandbox Deal."

*Id.* at 4-5. The UMF Informal Action then resolved that "the value of any invoices or demands for payment . . . by the Law Firm is zero; that no claims for services by the Law Firm has or could be deemed to constitute any consideration for any of [UMF's] stock; and that [UMF] including any of its Directors and Officers shall not tender, sell or exchange any of [UMF's] stock in consideration of any such demand or claim by the Law Firm." *Id.*

At some point, Clarke executed a similar document relating to Sweports. Based on a later document he executed on June 23, 2007, in which he described himself as "the sole

11

director" of Sweports, he must have acted previously by written consent to remove O'Rourke and Dore as directors of Sweports. There are references to such a document in the record. *See* JX 133; JX 139 at 11-12.

In addition to taking legal control, Clarke asserted physical control over the companies' offices and their property. He changed the locks and refused to let Dore onto the premises. Tr. 35 (Moody). He also took control of the companies' books and records.

On April 10, 2007, Clarke met with representatives of Sandbox. In return for a substantial payment from UMF, Sandbox agreed that there were no effective agreements among Sandbox, UMF, and Sweports. Feldman resigned from the UMF board. *See* JX 138.

In June 2007, Clarke executed a document titled "Informal Action in Lieu of a Special Meeting of the Directors of Sweports Ltd." JX 139 (the "Sweports Informal Action"). The document's detailed recitals spanned fourteen pages and recounted the history of the transactions and interactions among Sweports, UMF, the Law Firm, Sandbox, and their principals. The document adopted the following resolutions:

> 1.      . . . [A]ll of the above described agreements and actions . . . are part of one integrated and indivisible transaction and scheme committed and furthered by Sandbox, [the Law Firm], . . . Messrs. O'Rourke, Moody, . . ., Dore, [and others].
>
> 2.      Those business transactions by and between Sweports and Counsel and Mr. Dore . . . resulted from the self-dealing of Counsel and Dore, are unfair to, and never knowingly or properly approved by Sweports . . . and were effected as a direct result of the negligent, reckless and/or intentional breaches of the fiduciary duties owned by Counsel as attorneys, Messrs. O'Rourke, Moody and Dore as financial brokers and agents, and Messrs. O'Rourke [and] Dore . . . as Directors and/or Officers of Sweports and UMF, as set forth above and accordingly, Sweports rescinds all such agreements and actions, including all stock rights and certifications granted and/or issued to [the Law Firm] and Messrs. O'Rourke, Moody, . . . Dore, [and others].

12

3. Their various relationships with Sweports and UMF benefited Messrs. O'Rourke, Moody and Dore . . . Sweports and UMF received nothing of value in connection with the legal services and advice provided by [the Law Firm] or the work purportedly performed by Mr. Dore and, in contrast, suffered significant economic injury as a result of same . . .; accordingly, and because the rescission of these agreements and related agreements shall be addressed by some court of equity, Sweports has no obligation to return any such alleged consideration as part of this rescission of the above described documents and certificates, including specifically, the $100,000 paid to Sweports by Messrs. O'Rourke, Moody and Dore in connection with their respective purchases of 1% of Sweports common stock . . ., although Sweports will tender any such legitimate repayment, if any, when and to the extent that by final court order it is required to do so.

4. All of those other 2006 agreements purportedly entered into by UMF and/or Sweports . . . were effected as a direct result of this same . . . self-dealing, negligent, reckless and/or intentional breaches of the fiduciary duties owed by Counsel and Mr. Dore to Sweports and UMF . . . and, accordingly, to the extent that Sweports was a party to and/or it approved any such agreement or transactions, Sweports hereby rescinds all such transactions and agreements . . . .

. . . .

7.. Sweports hereby rescinds all retention agreements, if any, by and between it and [the Law Firm] . . . and all of their individual lawyers in their entirety.

8. Because of the above described acts and omissions of Counsel and Dore, Sweports hereby resolve, determines, and declares that it owes no monies whatsoever to any of these entities or individuals other than any amount found due and owing by a Court sitting in equity.

9. Sweports hereby resolves, determines and declares that the [Amended Bylaws] were null and void at the time of their purported approval and to the extent that one or more of the terms of these By-Laws might be construed as valid, Sweports hereby revokes, cancels and terminates these [Amended Bylaws] in their entirety.

*Id.* at 14-16. In this proceeding, Sweports has not relied on the purported invalidity of the

Amended Bylaws, nor on their subsequent purported revocation.

13

Consistent with the positions he took in the Informal Actions, Clarke refused to pay any amounts to the Law Firm and stopped making payments on the Bank Loan. As a result, the guarantors began making the payments. They did so for four years. Tr. 10 (Dore).

## I.      The Sweports Action

On October 26, 2007, the plaintiffs filed an action against Sweports and Clarke in the Illinois Circuit Court (the "Illinois Trial Court"). JX 2. The first count (mislabeled Count II) alleged that Sweports breached the Guarantee Agreement by unlawfully rescinding each of the plaintiffs' 3% interest in the company. This count sought damages in excess of $600,000. *Id.* at 4. The second count (mislabeled Count III) alleged that Clarke had breached his fiduciary duties by issuing the Informal Actions, which the complaint contended "were taken deliberately and maliciously to injure plaintiffs and to deprive them of their rights as shareholders." *Id*. It sought "actual damages in excess of $1,000,000 and punitive damages in excess of $5,000,000." *Id.* at 4-5. The third count (mislabeled Count IV) alleged that Sweports and Clarke had converted $100,000 that plaintiffs had invested in Sweports. It sought "actual damages in excess of $300,000 and punitive damages in excess of $5,000,000 for defendants' deliberate and malicious conversion of funds." *Id.* at 5. The Law Firm represented the plaintiffs.

On November 25, 2007, the plaintiffs brought a separate action against Sweports in the Illinois Trial Court, this time alleging that Sweports had defaulted under the Note. JX 3. The complaint asserted that approximately $300,000 was due on the Note, including accrued interest, attorneys' fees, and court costs. The Law Firm represented the plaintiffs.

By order dated February 5, 2008, the Illinois Trial Court consolidated the two actions. Because both actions focused on obligations of Sweports, this decision refers to the consolidated action as the "Sweports Action."

In April 2008, the plaintiffs filed a consolidated complaint in the Sweports Action. JX 5. It contained six counts. Count I sought three declaratory judgments regarding the effectiveness of the Sweports Informal Action, a determination that Sweports had deprived the plaintiffs of their shares, and a judicial valuation of their shares. Count II alleged that Sweports breached the Guarantee Agreement by unlawfully rescinding each of the plaintiffs' 3% interest in the company. The plaintiffs sought compensatory damages in excess of $50,000. Count III alleged that Clarke had breached his fiduciary duties as a director by taking the steps described in the Informal Actions. The plaintiffs sought compensatory damages in excess of $50,000, a judicial valuation of their rescinded shares, and punitive damages in excess of $1 million. Count IV alleged that Clarke had breached his fiduciary duties as a controlling stockholder by taking the steps described in the Informal Actions. The plaintiffs sought the same relief as in Count III. Count V alleged that Clarke and Sweports had converted the plaintiffs' shares by rescinding their stock. The plaintiffs sought the same relief as in Count III. Count VI sought an accounting from Sweports because of its failure to pay the Bank Loan.

In November 2008, for reasons that are not clear from the record, the plaintiffs amended their complaint to assert only claims for breach of contract. Count I alleged that Sweports had breached the Guarantee Agreement "by purporting to declare a rescission of the plaintiffs' stock rights in Sweports." JX 7 at 8 (the "Guarantee Claim"). This count

15

sought "compensatory damages in excess of $500,000." *Id.* Count II alleged that Sweports had breached the Note. *Id.* at 9 (the "Note Claim"). This count sought principal and interest in excess of $300,000 plus costs of collection. *Id.* at 10.

## J.     The Counterclaims

On January 14, 2008, Sweports and Clarke answered the consolidated complaint, raised twelve affirmative defenses, and asserted counterclaims against the plaintiffs. The counterclaims spanned forty-one pages and repeated and expanded on the assertions made in the Informal Actions. Count I of the counterclaims alleged that O'Rourke, Moody, and Dore breached their fiduciary duties to Sweports. Count II alleged that O'Rourke, Moody, and Dore engaged in fraud.

In a handwritten order dated March 13, 2009, the Illinois Trial Court dismissed the counterclaims with leave to re-plead. The order did not describe the reasons for the dismissal. JX 9.

Sweports filed a second set of counterclaims that elaborated on the factual background. By order dated July 21, 2009, the Illinois Trial Court dismissed the second set of counterclaims. JX 11. In a ruling that seems odd to a reader familiar with Delaware corporate law, the court dismissed Sweports' claim for breach of fiduciary duty against O'Rourke and Dore, both former directors, and Moody, a former agent and lawyer for Sweports, on the grounds that Sweports failed "to sufficiently [plead] facts that show the existence of a fiduciary relationship." *Id.* at 3. The court dismissed the fraud claim because it "failed to plead fraud with the required specificity." *Id.* at 4.

**K. Summary Judgment In The Sweports Action**

The plaintiffs moved for summary judgment in the Sweports Action. By order dated October 9, 2009, the Illinois Trial Court granted their motion as to the issue of liability, ruling that Sweports had failed to pay the amounts due under the Note and had deprived the plaintiffs of the equity they were entitled to under the Guarantee Agreement. JX 12. The Illinois Trial Court did not enter judgment as to a specific amount because it was necessary to hold a trial to determine the value of the plaintiffs' lost equity.

Up to this point, the Law Firm had been representing the plaintiffs in the Sweports Action without a formal retainer agreement. On October 22, 2009, Dore and the Law Firm entered into a contingency fee agreement, which provided that the Law Firm and another Chicago-based firm would "prosecute and/or settle all suits for claims against Sweports, Ltd., and/or George Clarke . . . for damages suffered as a shareholder in Sweports." JX 25. O'Rourke and Moody never entered into any type of written agreement with the Law Firm.

After the grant of summary judgment, Sweports filed a third set of counterclaims that contained additional allegations. In total, the counterclaims spanned eighty-six pages. This time, Sweports broke out its prior count for breach of fiduciary duty into four separate counts that identified the various capacities in which the counterclaim-defendants had acted. In a handwritten order dated January 19, 2010, the Illinois Trial Court dismissed the counterclaims with leave to replead. JX 14. The order did not describe the reasons for the dismissal.

Also on January 19, 2010, the Illinois Trial Court quantified the amount due on the Note Claim for principal and interest due. The total for these components as of that date was $397,520.16. *Id.*

## L.     The Untimely Fifth Set Of Counterclaims

After the dismissal of Sweports' third set of counterclaims, Sweports filed a fourth set. It added allegations, but largely tracked the third set. In an opinion and order dated June 24, 2010, the Illinois Trial Court dismissed them, citing a failure to attach necessary documents, a failure to join necessary parties, a failure to set forth a plain and concise statement of claim, and failure to state a claim on which relief could be granted. JX 16.

This time, the court did not grant Sweports leave to replead, so Sweports moved for leave to file a fifth set of counterclaims. *See* JX 19. Sweports attached its proposed pleading to its motion. The Illinois Trial Court granted the motion and ordered Sweports to file the counterclaims within seven days. *See* JX 2 at 22.

Sweports did not separately file the fifth set of counterclaims within the seven-day period. On December 1, 2010, Sweports moved for relief from the deadline so that it could file the counterclaims. The Illinois Trial Court denied that motion in early 2012.

## M.     The First Illinois Award

Meanwhile, having obtained summary judgment on the Note Claim, the plaintiffs petitioned for expenses under a provision in the Note that authorized the plaintiffs to recover expenses of collection. Titled "Lender's Rights," it stated: "If the payments due under this Note are not paid when due, Lender shall be entitled to collect all of his expenses

18

of collection, including court costs and reasonable attorneys' fees." JX 5 at 22 (the "Collection Provision").

In an opinion and order dated February 26, 2010, the Illinois Trial Court awarded the plaintiffs $125,780.75. JX 17 (the "First Illinois Award"). In reaching this result, the Illinois Trial Court rejected Sweports' argument that O'Rourke and Moody could not recover expenses because they effectively were representing themselves *pro se*. The court distinguished between O'Rourke and Moody and the Law Firm, explaining:

> O'Rourke and Moody did not represent themselves *pro se*. [The Law Firm] is not a party to the instant case; [the plaintiffs] are named as individuals. In addition, the individual Plaintiffs, not [the Law Firm], were parties to the [Guarantee Agreement] and the [Note] at issue in this case. O'Rourke and Moody were represented by [the Law Firm] and did not represent themselves.

*Id.* at 3.

The Illinois Trial Court also rejected the argument that the plaintiffs improperly sought to recover amounts incurred pursuing the Guarantee Claim. The court held that once the cases were consolidated, "charges that do not differentiate between the [Guarantee Claim] and the [Note Claim] are not unnecessarily duplicative because the issues are intertwined." *Id.* at 4.

## N.     The Stock Valuation Trial

Although the Illinois Trial Court had entered judgment and awarded collection costs on the Note Claim, it remained necessary to hold a jury trial on the Guarantee Claim to value the equity that Sweports had rescinded. JX 20 at 36. The Law Firm had been representing the plaintiffs, but an Illinois rule prevented the Law Firm from representing

members of the firm at trial.[3] Accordingly, O'Rourke and Moody entered into contingency fee agreements with Neal Wolfe & Associates, LLC, another Chicago-based law firm. JX 26; JX 33; Tr. 39 (Moody). They retained Neal Wolfe solely to "prosecute and/or settle the claims for damages against Sweports, Ltd., and/or George Clarke . . . that have been brought by Client against Defendants in the [Sweports Action]." JX 33.

During the lead-up to trial, Sweports filed a motion *in limine* seeking leave to try all pending issues in the case before the jury, including the counterclaims. JX 21 at 3. Sweports argued that the issues raised in its counterclaims implicated the extent to which the plaintiffs' conduct had depressed the value of the plaintiffs' stock so as to affect the amount of damages. *Id.* at 4-5. In a memorandum opinion and order dated March 11, 2011, the Illinois Trial Court denied leave to try the counterclaims but allowed Sweports to offer

---

[3] I am told this was the case. *See* Tr. 77 (Moody). The plaintiffs did not elaborate at trial or provide a citation. It is not clear to me whether this rule is comparable to Rule 3.7(a) of the Delaware Lawyers' Rules of Professional Conduct or whether it is something different. The Delaware rule provides as follows:

> (a)     A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless
>
> > (1)     the testimony relates to an uncontested issue;
> >
> > (2)     the testimony relates to the nature and value of legal services rendered in the case; or
> >
> > (3)     disqualification of the lawyer would work substantial hardship on the client.

Del. Lawyers' R. Prof'l Conduct 3.7(a).

evidence on "the impact of [the plaintiffs'] actions if they are relevant to the valuation inquiry." JX 31 at 4.

At trial, the plaintiffs presented valuation experts who "attempted to value the assets of Sweports and determine . . . [the] corresponding value" of the plaintiffs' stock. Tr. 61 (Moody). The experts cost $107,000. Tr. 74 (Moody). Sweports used the trial to introduce evidence on the matters that were the subject of the counterclaims. *See* JX 27.

After trial, the jury awarded damages of $345,000 to each of the plaintiffs. The Illinois Trial Court entered judgment in favor of the plaintiffs. By order dated March 16, 2012, the court rejected Sweports' motion for a new trial. On the same date, the court denied Sweports' motion for leave to file its fifth set of counterclaims, holding that they were untimely because Sweports had missed the seven-day deadline. These rulings brought the Sweports Action to a close at the trial level. Sweports appealed.

## O.     The UMF Action

Having failed to get the counterclaims past the pleading stage in the Sweports Action, Clarke caused UMF to assert substantively identical claims against the plaintiffs in a separate lawsuit in the Illinois Trial Court. *See* JX 37 (the "UMF Action"). The plaintiffs moved to dismiss, arguing that the claims were foreclosed by the Illinois Trial Court's rulings in the Sweports Action.

In an order dated August 9, 2012, the Illinois Trial Court agreed. JX 43. This ruling brought the UMF Action to a close at the trial level. UMF appealed.

**P.     The Bankruptcy Action**

Meanwhile, on April 9, 2012, the plaintiffs commenced involuntary bankruptcy proceedings against Sweports in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Bankruptcy Action"). Moody testified at trial that the plaintiffs filed the petition because they "felt it was the best way to recover the judgment amount [from the Sweports Action] . . . [and] protect the equity interests of Sweports' shareholders." Tr. 43 (Moody). The former is true, but the latter is not. The plaintiffs were creditors. They were adverse to Clarke, who owned a majority of the equity, and they later proposed a plan of reorganization that would have wiped out the equity. They were not trying to protect Sweports' stockholders. They were trying to collect in their capacity as creditors holding a judgment from the Sweports Action.

Sweports initially opposed the bankruptcy filing. JX 41. In November 2012, however, Clarke caused Sweports to consent to an order granting relief under Chapter 11. He testified in his deposition that Sweports' litigation costs were mounting and that he thought the automatic stay would help Sweports "control the legal costs." Clarke Dep. at 71.

In the resulting proceeding, Sweports' creditors filed twenty-three proofs of claim totaling approximately $5 million. Every creditor was either a party or an attorney in the state court actions involving Sweports and UMF. *See* JX 57 at 4. The plaintiffs submitted a proof of claim for $352,000 which they identified as a claim for indemnification under "Delaware Code Section 145 and Sweports By-Laws." JX 48.

In March 2013, Sweports filed a proposed plan of reorganization, which it subsequently amended at least six times (the "Sweports Plan"). Sweports proposed to reorganize "by paying all claims in full with interest over six years—provided those claims survive the objections to them—while Clarke and the other shareholders retain their equity interests." JX 57 at 5. The Sweports Plan depended heavily on Sweports recovering substantial amounts on various claims, including the counterclaims. At the time, the Illinois Trial Court had dismissed the counterclaims, although Sweports had appealed. Nevertheless, the Sweports Plan projected a recovery on the counterclaims of $15 million.

The bankruptcy court had appointed a committee of unsecured creditors. The plaintiffs were members. In May 2013, the committee proposed its own plan of reorganization (the "Committee Plan"). The Committee Plan proposed to "put an end to Sweports by transferring its assets to a liquidating trust that will sell them. The proceeds [would] then be distributed to the creditors as trust beneficiaries, provided that their claims survive objections." JX 57 at 5. Under the Committee Plan, the plaintiffs would serve as trustees for the liquidating trust.

By order dated March 26, 2014, the bankruptcy court rejected both plans. The court rejected the Sweports Plan because "the sources from which Sweports suggest[ed] that the money will come . . . [were] inadequate." JX 57 at 7. The court explained that

> Sweports provided no solid basis for believing the litigation on which its plan critically depends is likely to produce large sums of money in the near future or ever. To the contrary, the lawsuits are more speculative than most. Sweports' counterclaims in the consolidated actions have been dismissed and are on appeal. To generate funds, Sweports must not only prevail on appeal (never a likely prospect), [but] then prevail on the counterclaims themselves

23

either on summary judgment or at trial, and then actually collect on any judgment.

*Id.* at 15-16.

The bankruptcy court also rejected the Committee Plan. *Id.* at 20. The court noted that as trustees for the liquidating trust, the plaintiffs would have authority to dismiss Sweports' claims against them. Although Sweports' claims had little chance of success, "even a speculative and remote chance of victory means the trustees have a conflict of interest." *Id.* at 23 n.18. The bankruptcy court therefore rejected the plan, reasoning as follows: "[B]ecause the trustees of the liquidating trust have an obvious conflict of interest, they will not be permitted to serve. Because the [Committee Plan] designates trustees who cannot serve, the plan fails to provide for an adequate means of implementation and has not been proposed in good faith." *Id.* at 23.

The court invited the United States trustee to convert the reorganization into a liquidation or dismiss the case:

> The case has now been pending for two years – a long time for a chapter 11 case of this size. The case has also been extraordinarily contentious, contentious all out of proportion to the size of the creditors' claim and the company at stake . . . Allowed administrative expenses to date equal nearly one-third of UMF's gross revenue for 2013 . . . .
>
> The time has come to say "enough."

*Id.* at 27. The trustee moved to dismiss, and the court granted the motion.

## Q.     Proceedings On Appeal

Sweports appealed the final judgment in the Sweports Action, and UMF appealed the dismissal of the UMF Action. By order dated October 21, 2013, the Illinois Appellate Court affirmed the dismissal of the UMF Action, finding "ample reason for the [Illinois

24

Trial Court] to find that both this case and the previously filed one involve the same parties and the same cause." *UMF Corp. v. Dore*, 2013 WL 5745644, at *4 (Ill. App. Ct. Oct. 21, 2013); JX 52.

The appellate outcome in the Sweports Action was more complex. The Illinois Appellate Court affirmed the judgment on the Note, holding that Note did "not contain any other conditions to repayment, and it is undisputed that Sweports did not repay the debt." *Dore v. Sweports, Ltd.*, 2014 WL 1757896, at *3 (Ill. App. Ct. Apr. 28, 2014). But the court reversed the judgment on the Guarantee Claim. The court rejected most of Sweports' arguments, finding that they either "depend on the dismissed counterclaims and affirmative defenses . . . or are simply specious and therefore do not warrant discussion." *Id.* at *4. The court agreed, however, that one argument had merit: the plaintiffs had erred by framing their claim as one for breach of contract. As the Illinois Appellate Court saw it, Sweports had performed under the Guarantee Agreement when it issued equity to the plaintiffs. At that point, the contractual obligation was fulfilled. When Clarke later caused Sweports to rescind the grants, that action did not give rise to a claim for breach of contract, but rather "a claim for conversion or some similar tort." *Id.* The Illinois Appellate Court held that by choosing to sue for breach of contract, the plaintiffs had elected the incorrect remedy and therefore were not entitled to a judgment for breach of contract. Ironically, the plaintiffs had asserted claims for conversion, but they dropped them when they filed their amended and consolidated complaint. *Compare* JX 5 *with* JX 7; *see* Tr. 47-48 (Moody).

The Illinois Appellate Court held that the plaintiffs might have a claim for breach of contract under the Guarantee Agreement if Sweports had violated their preemptive rights

25

by engaging in an anticipatory repudiation of the Guarantee Agreement. Whether the Informal Actions constituted an anticipatory repudiation was an issue of fact. The court remanded for a retrial on that issue and any damages resulting from breach. *Dore*, 2014 WL 1757896, at *4.

Importantly for present purposes, the Illinois Appellate Court affirmed the dismissal of the counterclaims, including the denial of Sweports' motion for leave to file its last round of counterclaims. The Illinois Appellate Court agreed that the counterclaims had been filed late, relying in part on the fact that Sweports "acknowledged that it had failed to file the counterclaims" in timely fashion when it filed its second motion for leave in December 2010. *Id.* at *5.

On remand, the plaintiffs declined to pursue the claim for anticipatory repudiation of the Guarantee Agreement. They instead dismissed that claim with prejudice.

### R.      The Second Illinois Award

After the remand, the plaintiffs moved to recover additional amounts under the Collection Provision. They identified a total of $673,767.32 that they had incurred after the First Illinois Award through the issuance of the Illinois Appellate Court's affirmance in the Sweports Action. They broke down their request into four categories:

| Category | Description | Amount |
|---|---|---|
| A | Amounts sought in the motion that led to the First Illinois Award that the court had not addressed. | $21,135.86 |
| B | Amounts for collection, consisting of time spent in the Bankruptcy Action and on miscellaneous motions in the Illinois Trial Court. | $369,017.71 |

| C | Amounts incurred litigating and defeating the counterclaims and the UMF Action. | $183,630.00 |
|---|---|---|
| D | Amounts incurred addressing the appeals in the Sweports Action and the UMF Action. | $99,983.75 |

*See* JX 61 at 8; PTO ¶ 31.

On October 22, 2014, the Illinois Trial Court awarded all of the amounts in Category A. JX 64 at 25; JX 65. The court awarded $70,000 for Category D, which the court found comprised the total that related to the appeal of the Sweports Action. The court declined to award the balance, holding that they related to the appeal in the UMF Action. JX 64 at 25. The Illinois Trial Court did not award any amounts for Categories B and C. The total award was $91,135.86. JX 68 (the "Second Illinois Award").

In November 2014, the plaintiffs filed another motion that sought $200,909.32 for the period after the appeal in the Sweports Action through October 29, 2014. JX 67. By order dated January 20, 2015, the Illinois Trial Court awarded the plaintiffs $105,000. JX 69 (the "Third Illinois Award").

Sweports has paid the amounts due under the three Illinois awards, resulting in the plaintiffs receiving $321,916.61. Sweports also has satisfied the amounts due on the Note.

**S.      This Litigation**

On December 31, 2014, the plaintiffs filed this action. They initially sought indemnification only for expenses incurred in the Sweports Action and the UMF Action. They did not mention the Bankruptcy Action.

The parties cross-moved for summary judgment on the issue of liability. During briefing, the plaintiffs mentioned for the first time that they were seeking indemnification

for the Bankruptcy Action. *See* Dkt. 31 at 13. In a bench ruling on September 2, 2015, this court held that the counterclaims in the Sweports Action and the claims in the UMF Action named O'Rourke and Dore as defendants by reason of their status as directors and officers of Sweports, that O'Rourke and Dore were successful on the merits or otherwise in defending against those claims, and that O'Rourke and Dore therefore were entitled to mandatory indemnification under Section 145(c) of the DGCL. The court denied the plaintiffs' motion for summary judgment as to Moody because he only had a claim under the Amended Bylaws, it was possible that whether he acted in good faith would be a predicate to indemnification under the Amended Bylaws, and to the extent that good faith was in play, there were disputed issues of material fact as to whether Moody had acted in good faith in connection with the events that led to the proceedings for which he was seeking indemnification.

In the course of its ruling, the court rejected Sweports' argument that the plaintiffs' indemnification claims were barred by *res judicata* because of the fee awards made by the Illinois Trial Court. This court also rejected Sweports' contention that O'Rourke and Moody were not entitled to indemnification because they were members of the Law Firm that was representing them.

After this court's ruling on summary judgment, the parties prepared for trial. The issue of Moody's good faith became moot because of tactical decisions made by Sweports' counsel. Sweports' pre-trial brief did not advance evidence or argument regarding Moody's lack of good faith except to repeat the allegations contained in the Informal Actions. During trial, Sweports did not call Clarke as a witness or otherwise seek to prove that Moody had

not acted in good faith. Sweports' opening post-trial brief did not discuss good faith at all. During post-trial argument, Sweports' counsel effectively conceded that Sweports had not sought to litigate the issue. *See* Dkt. 94 at 97-98.

## T.     The Plaintiffs' Ever-Expanding Expenses

Instead of addressing the issue of good faith, the trial focused predominantly on the reasonableness of the expenses that the plaintiffs had requested. The amount that the plaintiffs sought increased dramatically during the course of the proceedings.

When the plaintiffs filed suit, they verified a complaint which asserted that they had incurred expenses "in excess of $750,000 in connection with their resolution of claims in the [Sweports Action] and UMF Action." JX 179 at 8. During discovery, that figure rose to "in excess of $950,000." JX 183 at 8. By the time of trial, that number had reached $1,258,821.09. The plaintiffs broke down this figure into nine separate categories:

| Action | Plaintiffs' Category | Amount |
|---|---|---|
| Sweports Action | Pre-Filing | $52,181.25 |
| | Defenses, Counterclaims, Motions | $390,388.75 |
| | Discovery | $201,367.50 |
| | Stock Valuation Trial | $209,196.25 |
| | Post-Trial | $18,931.25 |
| | Out-of-pocket Amounts | $135,671.09 |
| UMF Action | Trial Level | $45,322.50 |
| | Appeal | $22,088.75 |
| Bankruptcy Action | Bankruptcy Action | $183,673.75 |
| **Total** | | **$1,258,821.09** |

These figures diverged from the amount claimed in the proof of claim that the plaintiffs submitted in the Bankruptcy Action for amounts due under "Delaware Code Section 145 and Sweports By-Laws." JX 48. That claim was submitted *after* the completion

of the proceedings at the trial level in both the Sweports Action and the UMF Action. At the time, the plaintiffs submitted a claim for indemnification in the amount of $352,000.

More importantly, the plaintiffs' figures diverged from the amounts that the plaintiffs had verified in affidavits that they submitted to the Illinois Trial Court in 2014, after *both* the completion of the proceedings at the trial level in the Sweports Action and the UMF Action *and* the completion of proceedings on appeal. In support of the motion that led to the Second Illinois Award, O'Rourke submitted an affidavit in which he averred that the plaintiffs incurred a total of $183,630 litigating both the counterclaims in the Sweports Action and the claims in the UMF Action at the trial court level. The plaintiffs now seek $772,902.34 for the same proceedings.[4] O'Rourke averred in his affidavit that the plaintiffs had incurred $18,268.75 in connection with the appeal in the UMF Action. They now claim $22,088.75 for the same appeal.

Much of the difference arose because during the course of this action, O'Rourke and Moody altered the Law Firm's records. They edited many entries and added a host of new ones. They made these changes based on their supposed recollection of how much time they spent and the nature of the tasks they performed in the Illinois proceedings as much

---

[4] This amount represents the sum of the amounts claimed for Defenses, Counterclaims, and Motions; Discovery; Out-of-pocket Amounts; and the trial level in the UMF Action.

30

as eight years before. Yet during trial, when questioned by Sweports' counsel, they frequently failed to remember details about the same proceedings or the underlying events.[5]

Sweports spotted the edited descriptions by comparing the records submitted to this court with the records submitted to the Illinois Trial Court. The changes reflected a consistent effort to make the revised entries sound like they related to the counterclaims in the Sweports Action or the claims in the UMF Action. For example, when the plaintiffs sought an award from the Illinois Trial Court, O'Rourke's affidavit submitted an invoice in which Moody had made an entry for January 6, 2011, that was described as "Prepare summary judgment memorandum, affidavit in support." JX 59.0079. Yet when the plaintiffs submitted their time records in this proceeding, the same entry had been revised to read, "Prepare summary judgment memorandum re Sweports Counterclaims, affidavit in support." JX 160 at 57. The plaintiffs never filed a motion for summary judgment on the plaintiffs' counterclaims.

The plaintiffs revised their time entries to fit the expense-recovery provision that they were invoking. When seeking awards from the Illinois Trial Court, the plaintiffs relied on the Collection Provision. It was therefore in their interest to make as many entries as possible sound like collection expenses. Consistent with their behavior in this case,

---

[5] *See, e.g.*, Tr. at 59 (Moody uncertain who drafted contingency fee agreement with Wolfe); *Id.* at 120-21 (Moody uncertain whether or when plaintiffs filed a motion for summary judgment on the fourth amended counterclaims); Tr. at 224-25 (O'Rourke uncertain when depositions were taken for trial); Tr. at 251 (O'Rourke uncertain when he was named Sweports general counsel).

31

O'Rourke and Moody reviewed and revised their time records in 2010 and 2014 before making their applications to the Illinois Trial Court. Tr. 182-83 (Moody). The desire to shoehorn items into the scope of the Collection Provision explains why the plaintiffs claimed they spent less on the counterclaims and in the UMF Action when they filed their motion with the Illinois Trial Court than when they filed their proof of claim with the Bankruptcy Court ($183,630 vs. $352,000).

But once they had exhausted their ability to recover under the Collection Provision and filed this action, their theory of fee recovery shifted to the Amended Bylaws and Section 145(c). Particularly after this court granted summary judgment in their favor, it was in O'Rourke and Moody's interest that their entries emphasize the counterclaims in the Sweports Action and the claims in the UMF Action. So they revised them to suit their current theory.

O'Rourke and Moody also manufactured new entries. Sweports spotted them by analyzing the identification numbers for the individual time entries in the Law Firm's records. The Law Firm uses a computer program called "TimeSlips" to record billable time. The program assigns a sequential slip identification number ("Slip ID") to each time entry. PTO ¶ 39. The Slip ID cannot be changed once it has been assigned. PTO ¶ 41. When time entries are entered roughly contemporaneously, they bear similar Slip ID numbers. When time entries are entered years later, they bear Slip ID numbers that are thousands of entries higher than the entries that actually were entered during or shortly after the period in question. Sweports proved at trial that the following percentages of O'Rourke and Moody's time entries were added years after the fact.

| Action | Plaintiffs' Category | Total Amount | Later-Added Entries | % That Was Later-Added |
|---|---|---|---|---|
| Sweports Action | Pre-Filing | $52,181.25 | $30,118.75 | 57.72% |
| | Defenses, Counterclaims, Motions | $390,388.75 | $153,287.50 | 39.27% |
| | Discovery | $201,367.50 | $40,981.50 | 20.35% |
| | Stock Valuation Trial | $209,196.25 | $4,100 | 1.96% |
| | Post-Trial | $18,931.25 | $1,400 | 7.40% |
| | Out-of-pocket Amounts | $135,671.09 | $71,107.73 | 52.41% |
| UMF Action | Trial Level | $45,475.00 | $5,475.00 | 12.08% |
| | Appeal | $22,088.75 | $46.25 | 0.21% |
| Bankruptcy Action | Bankruptcy Action | $183,673.75 | $0 | 0% |
| **Total** | | **$1,258,821.09** | **$306,516.73** | **24.35%** |

Notably, the newly created entries were not distributed proportionately across categories. The categories that showed the largest increases related to the merits of the Sweports Action, where this court ruled on summary judgment that the plaintiffs were entitled to indemnification for amounts incurred defending against the counterclaims.

Equally notably, the newly created items contradicted the normal progression of human memory, in which recent events are recalled more clearly than distant ones. O'Rourke and Moody were better at remembering older time entries and amounts. For example, they created seventy-eight new entries in 2015 for work they supposedly did in prior years. Twelve were from February and March 2009, and seventeen were from July, August, and September 2010. They also recalled over $100,000 in out-of-pocket expenses that they incurred litigating the counterclaims during 2009 and 2010.

Caught red-handed, O'Rourke and Moody could not dispute that when preparing for trial, they changed their records. Instead, they contended that their modifications more accurately reflected the time they spent and the amounts they incurred. O'Rourke explained that the attorneys at the Law Firm had not been sufficiently careful when keeping their time or entering amounts contemporaneously. He swore that he and Moody revised their records to clarify and fix the shortcomings of entries recorded in the ordinary course of business.

Having heard O'Rourke and Moody testify and evaluated their demeanor, I conclude that they were not trying to be accurate. They fabricated new entries to gross up the size of their recovery, and they altered other entries to make them appear to fall within the scope of the indemnification that this court had authorized. This decision does not credit the later-added items.

## II. LEGAL ANALYSIS

Article VII of Sweports' Amended Bylaws provides as follows:

> Each person who at any time is or was a director, officer, employee, or agent of [Sweports] shall be indemnified by [Sweports] in accordance with and to the full extent permitted by the Delaware General Corporation Law as in effect at the time of adoption of this By-law or as amended from time to time. The foregoing right of indemnification shall not be deemed exclusive of any other rights to which a person seeking indemnification may be entitled under any bylaw, agreement, vote of shareholders or disinterested directors, or otherwise.

JX 112.0015-.0016. Because of Article VII, the plaintiffs are entitled to mandatory indemnification under the Amended Bylaws if indemnification would be permitted under the DGCL. *Von Feldt v. Stifel Fin. Corp.*, 714 A.2d 79, 81 (Del. 1998).

34

Section 145 of the DGCL addresses indemnification. Section 145(a) defines the circumstances under which a Delaware corporation has the power to provide indemnification in an action "other than by or in the right of the corporation." 8 *Del. C.* § 145(a). It states:

> A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than by or in right of the corporation) by reason of the fact that the person is or was a director, officer, employee or agent of the corporation . . . against expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred by the person in connection with such action, suit or proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation . . .

*Id.*

Section 145(b) defines the circumstances under which a Delaware corporation has the power to provide indemnification in an action "by or in the right of the corporation." *Id.* § 145(b). It states:

> A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that the person is or was a director, officer, employee or agent of the corporation . . . against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation . . .

*Id.*

In addition to the permissive authorization of indemnification set forth in Sections 145(a) and (b), Section 145(c) mandates that a Delaware corporation indemnify an

35

individual who was sued by reason of the fact that the individual served as a director or officer if the individual was successful on the merits or otherwise in defending against the claim. Section 145(c) states:

> To the extent that a present or former director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.

*Id.* § 145(c). Section 145(c) only covers directors and officers. But when a corporation has provided other authorized individuals with mandatory indemnification to the fullest extent of the law, then that right extends the mandatory indemnification contemplated by Section 145(c) to those individuals. *Stockman v. Heartland Indus. P'rs, L.P.*, 2009 WL 2096213, at *13 (Del. Ch. July 14, 2009) (Strine, V.C.); *Zaman v. Amedeo Hldgs., Inc.*, 2008 WL 2168397, at *16 (Del. Ch. May 23, 2008) (Strine, V.C.).

"Section 145 serves the dual policies of: (a) allowing corporate officials to resist unjustified lawsuits, secure in the knowledge that, if vindicated, the corporation will bear the expense of litigation; and (b) encouraging capable women and men to serve as corporate directors and officers . . . ." *Von Feldt*, 714 A.2d at 84. Section 145 should be "broadly interpreted to further the[se] goals." *Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 561 (Del. 2002). Delaware courts accordingly "eschew [a] narrow construction of the statute where an overliteral reading would disserve these policies." *VonFeldt*, 714 A.2d at 84.

When assessing an indemnification claim, typically "the first inquiry that must be made is whether the expense incurred . . . has been incurred in connection with a covered

36

proceeding." *Shearin v. E.F. Hutton Gp., Inc.*, 652 A.2d 578, 593 (Del. Ch. 1994) (Allen, C.). A covered proceeding is a "civil, criminal, administrative or investigative" action in which the individual seeking indemnification was "a party or threatened to be made a party by reason of the fact that the individual is or was a director, officer, employee, or agent of the corporation . . . ." 8 *Del C.* § 145(a); *accord id.* § 145(b). When a corporation has provided individuals with mandatory indemnification to the fullest extent of the law, the corporation bears the burden of proving that the individual is not entitled to indemnification. *See, e.g.*, *O'Brien v. IAC/Interactive Corp.*, 2010 WL 3385798, at *5 (Del. Ch. Aug. 27, 2010), *aff'd*, 26 A.3d 174 (Del. 2011).

This court held when granting summary judgment that the UMF Action and the portion of the Sweports Action that related to the counterclaims were covered proceedings. *See* Dkt. 37 at 46. Those determinations are the law of the case. *See Zirn v. VLI Corp.*, 1994 WL 548938, at *2 (Del. Ch. Sept. 23, 1994) (Allen, C.) ("Once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears."). The summary judgment ruling did not address whether the Bankruptcy Action or other aspects of the Sweports Action qualify for indemnification.

Once a court has found that a proceeding is covered, the court must determine whether the plaintiffs' expenses were "actually and reasonably incurred" in connection with that proceeding. *See* 8 *Del. C.* § 145(a); *Id.* § 145(b). When evaluating an indemnification request, Delaware courts have considered the following questions:

(i) "were the expenses actually paid or incurred;"

(ii) "were the services that were rendered thought prudent and appropriate in the good faith professional judgment of competent counsel;" and

(iii) "were charges for those services made at rates, or on a basis, charged to others for the same or comparable services under comparable circumstances."

*IAC/InterActiveCorp. v. O'Brien*, 26 A.3d 174, 179 (Del. 2011) (internal quotations omitted). Even under a mandatory, full-extent-of-the-law bylaw, "the party seeking indemnification . . . must prove that the amount of indemnification sought is reasonable." *O'Brien*, 2010 WL 3385798, at *5.

Determining whether expenses are reasonable "is necessarily a facts and circumstances inquiry." Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 8.02[c], at 8-27 (2012). This decision already has determined as a factual matter that O'Rourke and Moody's belatedly added expenses that were not actually incurred. The parties have stipulated that the rates charged by the Law Firm were reasonable.

## A.    The Pre-Filing Phase

The plaintiffs seek indemnification for time spent investigating potential responses to the Informal Actions during the period leading up to October 2007, when they sued for breach of the Guarantee Agreement and asserted other claims. The plaintiffs sought $52,181.25 for this category. This decision has rejected later-added entries that amounted to $30,118.75. The plaintiffs have proven that they are entitled to indemnification for the remaining $22,062.50.

The plaintiffs contend that the expenses they incurred during the pre-filing phase are indemnifiable because the Sweports Informal Action "threatened litigation by its references to its rescission of and determination of [the plaintiffs'] rights by a court of equity." Dkt. 77 at 39. There is little case law addressing what constitutes threatened litigation for purposes of Section 145.[6] In *Schoon v. Troy Corp.* 948 A.2d 1157 (Del. Ch. 2008), Vice Chancellor Lamb found that a corporation had threated litigation by attempting unsuccessfully to assert breach of fiduciary claims as counterclaims in a director's statutory action to obtain books and records. *Id.* at 1170. In *Donahue v. Corning*, 949 A.2d 574 (Del. Ch. 2008), Chief Justice Strine, then serving as a Vice Chancellor, held that the removal of an officer for alleged breaches of fiduciary duty did not rise to the level of threatened litigation when unaccompanied by any indication that the corporation would file a lawsuit. *Id.* at 581.

In this case, the Sweports Informal Action both removed the plaintiffs from their positions and contained three references to litigation. The first two occurred in the following passage:

> [The plaintiffs'] various relationships with Sweports and UMF benefited Messrs. O'Rourke, Moody and Dore by, for example, allowing them to repay approximately $208,000 of their personal debt to [the Bank] with Sweports' money and with Dore, by his receipt of a salary totaling $50,000 plus benefits; Sweports and UMF receiving nothing of value in connection with the legal services and advice providing by [the Law Firm] . . . or the work purportedly performed by Mr. Dore and, in contrast, suffered significant

---

[6] The issue has been explored outside of the Section 145 context. *See Reaxam Inc. v. Berry Plastics Corp*, 2015 WL 7958533 (Del. Ch. Dec. 3, 2015); *i/mx Info. Mgmt. Solutions, Inc. v. Multiplan, Inc.*, 2014 WL 1255944 (Del. Ch. Mar. 27, 2014).

economic injury as a result of same, including Mr. Dore's efforts in pursuit of his other business interests while supposedly serving as an officer of Sweports and COO of UMF; the acts and omissions of [the plaintiffs] have directly caused Sweports and UMF to be currently unable to return any considerations provided by any one of these individuals . . .; *accordingly, and because the rescission of these agreements and related agreements shall be addressed by some court of equity*, Sweports has no obligation to return any such alleged consideration as part of this rescission of the above described documents and stock certificates, including specifically the [Guarantee Agreement and the Note], *although Sweports will tender any such legitimate repayment, if any, when and to the extent that by final court order it is required to do so.*

JX 139 ¶ 3 (emphasis added). The third reference occurred near the end of the Sweports Informal Action: "Because of the above described acts and omissions of [the Law Firm] and Dore, Sweports hereby resolves, determines and declares that it owes no monies whatsoever to any of these entities or individuals other than any amount found due and owing by a Court sitting in equity." *Id.* ¶ 8.

Although the Sweports Informal Action did not expressly threaten litigation, it detailed the plaintiffs' purported misconduct at considerable length. It spent multiple pages describing the interactions among the parties, starting with the earliest discussions with Sandbox and leading up to the events that precipitated Clarke's reassertion of control. It summarized these events by asserting that "all of these acts and omissions were part of an intentional plan to improperly seize control of Sweports." *Id.* at 8. Read in full context, the Sweports Informal Action threatened litigation against the plaintiffs for breaching their fiduciary duties. *Cf. Multiplan, Inc.*, 2014 WL 1255944, at *6.

Sweports' only other objection to the pre-filing expenses is that the category included time responding to the UMF Informal Action, which did not refer to future

40

litigation. Although technically true, the UMF Informal Action was hardly a pacifistic document. It recited that the Law Firm had provided various services to UMF, then asserted that the services were "negligently performed, not performed in the best interests of [UMF] or its shareholders, and in breach of the Law Firm's fiduciary duties to the corporation and its shareholders[.]" JX 136 at 4. It further asserted that "[n]one of the monies sought by the Law Firm from [UMF] are in fact owed . . . [and] the Law Firm is in material part responsible for damages due to the Corporation from its acts and omissions, including without limitation, damage from the Alleged Sandbox Deal." *Id.* at 4-5. It formally resolved that O'Rourke had never been validly appointed as a director of UMF. *Id.* at 3. In the factual context giving rise to this case, it is not practical to distinguish between the Informal Actions. Both were premised on the same course of conduct. Both were part of Clarke's effort to regain control over Sweports and UMF. *See Zaman*, 2008 WL 2168397, at *24 (declining to distinguish among multiple lawsuits for purposes of indemnification where all asserted similar claims predicated on the same "master scheme").

The plaintiffs are therefore entitled to indemnification for the pre-filing phase. Excluding later-added time entries, plaintiffs are entitled to $22,062.50 for this phase. This is a reasonable amount for the plaintiffs to have incurred investigating and analyzing the complex issues raised by the Informal Actions and the course of dealing that led up to them.

## B. The Contract Claims

The plaintiffs next claim that they are entitled to indemnification for expenses incurred prosecuting their affirmative claims for breach of contract in the Sweports Action,

41

*i.e.* the Note Claim and the Guarantee Claim (together, the "Contract Claims"). The plaintiffs are not entitled to indemnification for these claims.

"[I]ndemnification claims will include those deriving from lawsuits brought by directors, officers, agents, etc., only insofar as the suit was brought as part of the employee's duties to the corporation and its shareholders." *Shearin*, 652 A.2d at 594. An individual is not entitled to indemnification for "litigating a specific and personal contractual obligation that does not involve the exercise of judgment, discretion, or decision-making authority on behalf of the corporation." *Paolino v. Mace Sec. Int'l, Inc.*, 985 A.2d 392, 403 (Del. Ch. 2009). The plaintiffs pursued their Contract Claims to enforce their rights as creditors and guarantors. The enforcement of these rights did not implicate their duties to Sweports. The Contract Claims were purely personal claims that do not qualify for indemnification.[7]

To avoid this straightforward result, the plaintiffs have argued that they prosecuted the Contract Claims defensively "because Sweports' entire legal basis for denying [the plaintiffs] their contractual rights was [the plaintiffs'] conduct as directors, officer [sic] and agents." Dkt. 77 at 42. Delaware courts have held that if a corporation brings indemnifiable claims against an individual, then the individual also will be indemnified for any

---

[7] *See, e.g.*, *Radiancy, Inc. v. Zion Azar*, 2006 WL 4762868, at *3 (Del. Ch. Jan. 23, 2006) ("Delaware law [distinguishes] between entirely personal claims and claims brought 'by reason of' the director's duties."); *Cochran v. Stifel Fin. Corp.*, 2000 WL 1847676, at *7 (Del. Ch. Dec. 13, 2000) (Strine, V.C.) (denying indemnification for claim alleging a breach of officer's employment agreement), *rev'd on other grounds*, 809 A.2d 555 (Del. 2002)

counterclaims that are "necessarily part of the same dispute and were advanced to defeat, or offset" the corporation's claims. *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 824 (Del. 1992). This rule encompasses personal counterclaims that otherwise would not qualify for indemnification as long as an aspect of the counterclaim would negate an element of the corporation's suit. *See Zaman*, 2008 WL 2168397, at *37. In *Zaman*, Chief Justice Strine ruled when serving as a Vice Chancellor that individuals were entitled to indemnification for counterclaims that asserted breach of contract theories because success on the counterclaim "negate[d] the allegation that the formation of the contract was tainted by fiduciary misconduct." *Id.*

The plaintiffs cast this case as the natural progression from *Zaman*. Rather than suing first, Sweports engaged in self-help by asserting that the plaintiffs had breached their fiduciary duties and then relying on that contention to repudiate the Note and rescind the equity granted under the Guarantee Agreement. Dkt. 94 at 31-32. According to the plaintiffs, they had no choice other than to bring the Contract Claims, and Delaware's policy favoring indemnification "would be thwarted if corporations could avoid indemnification simply by imposing their chosen remedy . . . based on alleged breaches of fiduciary duty, and then when sued by the fiduciaries, deny indemnification on the grounds that indemnitees were suing to enforce contractual rights." Dkt. 77 at 41.

In my view, it is conceivable that indemnification might be warranted for preemptive litigation involving personal claims that sought to negate a threatened breach of fiduciary duty claim by the defendant. Depending on how the plaintiff pled and litigated its affirmative claims, indemnification might be available if disposition of the personal

43

claims would determine definitively whether the plaintiffs had breached their fiduciary duties.[8] In this case, however, the plaintiffs chose to pursue their claims as pure breach of contract theories untethered to their conduct as Sweports' fiduciaries. As shown by their initial complaint, they could have proceeded differently and included different theories. *See* JX 5 at 6. But when the plaintiffs filed the consolidated complaint on which they chose to litigate, they dropped their other counts and elected to pursue two focused breach of contract claims. *See* JX 7. They subsequently sought to maintain the narrow focus of their claims by repeatedly defeating Sweports' efforts to assert the counterclaims. Both the Illinois Trial Court and the Illinois Appellate Court treated the Note Claim as a straightforward collection action. The Illinois Trial Court treated the Guarantee Claim as a straightforward breach of contract action. Although the Illinois Appellate Court disagreed, it viewed the Guarantee Claim as a straightforward claim for conversion. Neither court treated the claims as involving or negating theories of breach of fiduciary duty.

In this case, the Contract Claims were personal to the plaintiffs as lenders and guarantors. The claims lacked a sufficient nexus to the allegations that appeared in Sweports' counterclaims to warrant indemnification. *See Gentile*, 787 A.2d at 109 (denying

---

[8] *Compare In re Genelux Corp.*, 2015 WL 6390232, at *4 (Del. Ch. Oct. 22, 2015) (permitting indemnification for intervenor where collateral estoppel might bar his claim in subsequent proceeding) *with Gentile v. Singlepoint Fin., Inc.*, 787 A.2d 102, 110 (Del. Ch. 2001) (denying indemnification for intervenor where party's claims would not necessarily be barred in subsequent proceeding). *But see Baker v. Impact Hldg., Inc.*, 2010 WL 2979050, at *6 n.33 (Del. Ch. July 30, 2010) ("I do not read *Roven* and *Zaman* as providing a basis for taking the unprecedented step of finding affirmatively filed, preemptive declaratory judgment actions 'defensive.'").

indemnification claim for offensive litigation where plaintiff failed to plead facts implicating his corporate duties). The plaintiffs are not entitled to indemnification for this aspect of the Sweports Action.

## C. The Counterclaims

As noted, this court held when granting summary judgment that the portions of the Sweports Action that related to the counterclaims were covered proceedings. *See* Dkt. 37 at 46. Excluding the valuation trial, which is addressed separately, the plaintiffs sought $390,388.75 for litigating the defenses, counterclaims, and motions and $201,367.50 for discovery. This decision has excluded $153,287.50 in later-added entries from the former category, leaving a request for $237,101.25. This decision has excluded $40,981.50 in later-added entries from the latter category, leaving a request for $160,386. The plaintiffs also have sought out-of-pocket expenses in the amount of $135,671.09. This decision has excluded later-added expenses in the amount of $71,107.73, leaving a request for $64,563.63. The aggregate request for counterclaims-related expenses is $462,050.61.

When applying to the Illinois Trial Court for an award in 2014, the plaintiffs represented that they incurred $183,630 at the trial level defending against both the counterclaims in the Sweports Action *and* the claims in UMF Action. At trial, O'Rourke attempted to explain why the plaintiffs' submissions in this case so far exceed the amount that he averred was true in the affidavit he submitted to the Illinois Trial Court:

> This affidavit related to the time period beginning in December of 2010, and it related to the collection clause in the promissory note. It did not include any pre-filing time because it was limited—it was limited to the collection— or the promissory note collection provision. It did not include any evaluation time, either discovery or trial or—and it did not include any appeal time,

which was separately recorded; and, also, it had—it reflected no request for—or fees in connection with the bankruptcy because bankruptcy, that was a separate matter and not covered at all in the promissory note.

So what I was trying to do here was just set out a discrete and separate category of time related to the counterclaims which I thought was recoverable. I thought it was recoverable under the promissory note. [The Illinois Trial Court] disagreed and denied it, but it was only to separately categorize the time. It was not intended to encompass time before that or time before litigation or the shareholder case or in the bankruptcy or in appeals.

Tr. 212-13 (O'Rourke).

O'Rourke's explanation is not credible. Contrary to O'Rourke's testimony, the plaintiffs included expenses incurred in the Bankruptcy Action in their application to the Illinois Trial Court. *See* JX 61.0071-75; *see also* JX 63.0010. They also included amounts related to discovery. *See* JX 61.0068-71.

O'Rourke was similarly mistaken about how the plaintiffs treated amounts related to the counterclaims in the Sweports Action. What the plaintiffs actually argued to the Illinois Trial Court was that they were entitled to recover all of their expenses in the Sweports Action because their own affirmative claims and Sweports' counterclaims were intertwined. *See* JX 63 at 12. O'Rourke was equally mistaken about whether the application to the Illinois Trial Court in 2014 included amounts incurred before June 25, 2010. It did not, but not because the plaintiffs limited their application to collection expenses. The application omitted earlier amounts because the plaintiffs already had sought and received an award for this time period in the First Illinois Award. Tr. at 295 (O'Rourke); *see, e.g.*, JX 63.0011, 63.0036-43.

46

What really happened is that when the plaintiffs made their application to the Illinois Trial Court, they were pursuing a recovery under the Collection Provision. They argued that all of the expenses were interconnected, but they knew this argument might not prevail. Because of the provision they were invoking, they were more likely to recover amounts that related to the Contract Claims and less likely to recover amounts that related to the counterclaims. When O'Rourke submitted his affidavit to the Illinois Trial Court, he sought to maximize the plaintiffs' recovery by pushing amounts into the collection bucket. The amount later changed not because of the nature of the underlying legal work, but because when the plaintiffs took a second bite at the apple in this court, O'Rourke and Moody sought to maximize their recovery by pushing amounts into the counterclaims bucket.

Under the circumstances, the plaintiffs are bound by their representation to the Illinois Trial Court and cannot recover more than the amounts that they sought in that proceeding. As noted, they represented to the Illinois Trial Court that the figure of $183,630 encompassed the amounts incurred at the trial court level defending against the counterclaims in the Sweports Action and against the claims in UMF Action. This decision awards $183,630 for both proceedings.

## D.    The Stock Valuation Trial

The plaintiffs seek indemnification for amounts incurred during the trial in the Sweports Action. The sole purpose of the trial was to value the equity that Sweports had rescinded. Tr. 61 (Moody). This decision therefore refers to it as the "Stock Valuation Trial." The plaintiffs are not entitled to any amounts for the Stock Valuation Trial.

The Stock Valuation Trial exclusively addressed plaintiffs' damages for the Guarantee Claim. The plaintiffs hired valuation experts to value Sweports and they presented their testimony to the jury. The Stock Valuation Trial was the damages phase for one of the Contract Claims, which this decision already has held was a personal claim and not subject to indemnification.

The plaintiffs contend that they should receive some amount for the Stock Valuation Trial because the Illinois Trial Court permitted Sweports to introduce evidence relating to its counterclaims. That is true, but the Stock Valuation Trial remained insufficiently connected to the counterclaims to warrant indemnification. The evidence was admitted only to the extent it could affect valuation. The jury had no authority to decide whether the evidence supported a claim for breach of fiduciary duty. Nor was Sweports litigating its counterclaims at the time of the trial. Although the counterclaims had not been dismissed by a final order, the Illinois Trial Court had dismissed them on four occasions, and Sweports had failed to timely file a fifth set of counterclaims. Unless the Illinois Trial Court forgave this procedural default, the counterclaims at the trial level were no longer viable. The evidence that the parties introduced regarding the counterclaims during the Stock Valuation Trial did not serve "defeat or offset" Sweports' counterclaims. *Roven*, 603 A.2d at 824. It served to affect the damages calculation on the plaintiffs' personal claim under the Guarantee Agreement.

The Stock Valuation Trial therefore falls outside the scope of the plaintiffs' indemnification right. The plaintiffs are not entitled to any amount for this phase.

E.     **The Post-Trial Phase**

The final phase of the Sweports Action is the post-trial phase. JX 154. The primary issue during this phase was Sweports' motion for a new trial, in which Sweports argued that the Illinois Trial Court had erred by failing to permit Sweports to litigate its counterclaims. Tr. at 168-69 (O'Rourke). Sweports' motion for a new trial was an extension of Sweports' efforts to assert the counterclaims, resulting in this phase being covered for purposes of indemnification.

Excluding later-added time entries, the plaintiffs have requested $17,531.25 for the post-trial phase. This is a reasonable figure.

F.    The UMF Action

As noted, this court held when granting summary judgment that the UMF Action was a covered proceeding for which the plaintiffs were entitled to indemnification. The plaintiffs broke down their request for the UMF Action into two categories: trial level expenses and appellate expenses. This decision already has held that the plaintiffs are limited at the trial level to the amount of expenses that they sought from the Illinois Trial Court as part of their combined request relating to the counterclaims in the Sweports Action and the claims in the UMF Action. The plaintiffs are not entitled to any additional trial-level expenses.

The plaintiffs previously sought an award for the UMF Action appeal, but the Illinois Trial Court held that this proceeding fell outside the scope of the Collection Provision. These amounts instead fall squarely within the scope of the plaintiffs' indemnification right.

In their 2014 submissions to the Illinois Trial Court, the plaintiffs represented that they had incurred $18,268.75 for the UMF appeal. Excluding later-added entries, they now claim $22,042.50 for the same matter. They have not explained the difference. They are bound by their earlier representation to the Illinois Trial Court. Sweports does not oppose awarding the plaintiffs $18,268.75, which is a reasonable amount.

Accordingly, the plaintiffs are awarded $18,268.75 for the UMF Action. This award recognizes that the $189,630 that this decision previously awarded for work at the trial level in the Illinois proceedings encompasses that phase of the UMF Action.

## G. The Bankruptcy Action

Beginning with their summary judgment motion, the plaintiffs sought indemnification for the Bankruptcy Action. They reasoned that they are entitled for all of their expenses in the Sweports Action, and therefore they are entitled to amounts incurred attempting to collect the judgment they obtained in the Sweports Action. They posited that they filed the Bankruptcy Action as part of their collection effort, so they are entitled to expenses for the Bankruptcy Action. They separately argued that they are entitled to indemnification for their efforts to respond to the Sweports Plan, because "Sweports' numerous reorganization plans were premised on the successful prosecution of the Counterclaims." Dkt. 77 at 50-51.

The plaintiffs indeed used the Bankruptcy Action as a collection vehicle for the judgment they obtained on their Contract Claims, which is why they cannot recover for the Bankruptcy Action. The Contract Claims were personal claims that are not subject to

indemnification, so efforts to collect on the judgment obtained on the Contract Claims are not subject to indemnification.

The plaintiffs come closer by limiting their request to their efforts to oppose the Sweports Plan, but the nexus between the plan and the counterclaims is too attenuated. The bankruptcy court lacked jurisdiction to adjudicate the counterclaims because of the ongoing proceedings in the Illinois state courts. *See* 11 U.S.C. § 1334(c)(2) (2013). The bankruptcy court also faced a potential constitutional impediment to adjudicating the exclusively state law claims. *See Stern v. Marshall*, 564 U.S. 462, 493 (2011). In any event, the bankruptcy court did not need to rule on the merits of the counterclaims to assess the Sweports Plan, and the court did not do so. It rejected the Sweports Plan because of uncertainty about the funding source, explaining that "[i]n the best of cases, a debtor's reliance on litigation recoveries to fund a plan would be doubtful," and that in Sweports' case, reliance on a recovery "from an action it has lost (at least for now) . . . is especially so." *Id.* at 16. To reach this conclusion, the bankruptcy court only had to observe the procedural posture of the counterclaims in the Illinois state courts.

At most, the Bankruptcy Action considered the counterclaims in a manner akin to the Stock Valuation Trial, albeit as a source of potential value for the bankruptcy estate rather than as a basis for valuing the equity that was rescinded. This decision already has explained that indemnification is not available for the Stock Valuation Trial. Expenses incurred in the Bankruptcy Action are similarly not subject to indemnification.

51

## H. Whether The Plaintiffs Incurred Any Expenses

Sweports has argued that the plaintiffs cannot recover anything in this proceeding because none of their expenses were "actually and reasonably incurred." 8 *Del. C.* § 145(a); *accord id.* § 145(b), 145(c). They rely on the *Scion Breckinridge* case, in which the plaintiffs asserted claims under a series of contracts, each of which contained the following fee-shifting provision: "In the event that any of the parties to this Agreement undertakes any action to enforce the provisions of this Agreement against any other party, the non-prevailing party shall reimburse the prevailing party for all reasonable costs and expenses incurred in connection with such enforcement, including reasonable attorneys' fees. . . ." *ASB Allegiance Real Estate Fund v. Scion Breckinridge Managing Member, LLC*, 2012 WL 1869416, at *20 (Del. Ch. May 16, 2012), *rev'd in pertinent part*, 68 A.3d 665 (Del. 2013). To resolve the threat of a malpractice action relating to their role in preparing the underlying contracts, the plaintiffs' lawyers agreed that they would not seek payment from the plaintiffs. *Id.* at 20. After the plaintiffs prevailed, I held that the fee-shifting provision permitted the plaintiff to recover the law firm's expenses, reasoning as follows:

> The purpose of the contractual fee-shifting provision is to allocate the burden of contract enforcement between the breaching party and the non-breaching party. Arrangements that the non-breaching party may have made internally or with third parties to minimize or lay off its own burdens do not affect the breaching party's liability. If, for example, [the plaintiff] had obtained litigation insurance such that its fees and expenses were covered by an insurer, that fact would not eliminate Scion's obligation under the fee-shifting provision. Either ASB or the insurer by subrogation could enforce the fee-shifting provision. Here, the non-breaching side of the case caption litigated the dispute at significant cost, albeit a cost that DLA Piper and ASB have allocated between themselves. The contractual fee-shifting provision obligates the breaching side of the caption to bear that cost, regardless of the allocation between DLA Piper and ASB.

*Id.* The Delaware Supreme Court reversed. The high court held that the plaintiff had not "incurred" any fees because the plaintiff "made no payment for which it needed to be repaid or indemnified." *Scion Breckenridge*, 68 A.2d at 683. Elaborating, the high court explained that "'[r]eimburse' and 'incur' clearly and unambiguously indicate that [the plaintiff] must have been liable for a payment at some point." *Id.* at 684.

Relying on *Scion Breckenridge*, Sweports makes two arguments. The first is that the only written fee agreements that the plaintiffs had with any law firms were contingency fee agreements. The only claims on which the plaintiffs prevailed and which therefore could have resulted in the plaintiffs becoming liable for a payment were the Contract Claims. The plaintiffs did not become liable for a contingent fee payment on the Note Claim, because the plaintiffs recovered their expenses for that claim under the Collection Provision. Any contingent fee obligation was satisfied through the Collection Provision, so the plaintiffs did not incur anything. The plaintiffs did prevail at the trial court level on the Guarantee Claim, but the Illinois Appellate Court reversed, and the plaintiffs did not pursue that claim further. Consequently, because the plaintiffs did not prevail on the Guarantee Claim, they did not become liable for any payment to their counsel on that claim. The *Scion Breckinridge* decision supports this view, because the court cited with approval a decision in which Vice Chancellor Parsons held that a contingent fee arrangement only gave rise to an indemnifiable expense if the plaintiff prevailed; otherwise there was no obligation to pay the attorney and no indemnifiable expense. *See id.* at 683 (discussing *O'Brien*, 2010 WL 3385798, at *7). Sweports concludes that the plaintiffs never owed any money to the Law Firm and therefore never incurred any indemnifiable expense.

The simple answer to Sweports' argument is that the contingency fee agreements covered aspects of the proceeding that are not subject to indemnification. O'Rourke and Moody entered into a contingency fee agreement with the Neal Wolfe firm for the Stock Valuation Trial. JX 33. This decision already has held that the plaintiffs are not entitled to recover anything for the Stock Valuation Trial; otherwise the contingency fee arrangement could provide a separate reason for denying those expenses. The agreement with the Neal Wolfe firm did not encompass work performed defending against the counterclaims in the Sweports Action or the claims in the UMF Action, so it is irrelevant to whether indemnification is available for those expenses.

Dore entered into a contingency fee agreement with the Law Firm and another Chicago firm to pursue all claims for damages against Sweports and Clarke that Dore had "suffered as a shareholder in Sweports." JX 25. As with the agreement with Neal Wolfe, this contingency fee agreement did not encompass work performed defending against the counterclaims in the Sweports Action or the claims in the UMF Action. It too is irrelevant to whether indemnification is available for those expenses.

Consequently, neither of the contingency fee agreements covered the expenses that are subject to indemnification. This leads to Sweports' alternative contention, which is that the plaintiffs did not have any agreement to pay the Law Firm, and that as a practical matter the Law Firm will not seek to recover any expenses from the plaintiffs that Sweports is not ordered to pay. That was the situation in *Scion Breckinridge*, but unlike in that case, there is nothing formal in the record to this effect. Sweports contends that the reality of such an arrangement is readily inferable because the Law Firm only has four partners; two of the

54

four are O'Rourke and Moody; O'Rourke and Moody each own a 30% interest in the Law Firm, giving them a majority interest in the Firm; O'Rourke is the managing partner of the firm; and one of the other two partners is O'Rourke's son. Sweports also observes that the Law Firm has not sent out invoices or demanded payment during the course of its representation. Although Dore and Moody each testified that they had paid fees, those payments appear to have been made only after the plaintiffs recovered amounts in the underlying action. *See* Tr. 13 (Dore); Tr. 40, 73 (Moody).

The plaintiffs concede that there is no written agreement that would obligate them to pay any fees to the Law Firm. But the plaintiffs testified that they each have an oral agreement with the Law Firm to pay fees on an hourly basis and to reimburse the Law Firm for amounts paid out of pocket. The plaintiffs also testified that they will have an obligation to pay the Law Firm's invoices if they are not successful in this action. *See* Tr. 12-14 (Dore); Tr. 39-41 (Moody); Tr. 199-200 (O'Rourke). Except for contingency fee agreements, which must be in writing, an oral retainer agreement is enforceable under Illinois law so long as the "material terms of the contract are definite and certain." *Bruzas v. Richardson*, 945 N.E.2d 1208, 1215 (Ill. App. Ct. 2011). This standard is satisfied "if a court is able to ascertain what the parties have agreed to." *Id.* In this case, the plaintiffs testified that they are obligated to pay the Law Firm the amounts they sought from Sweports if those amounts are not paid by Sweports. This is an ascertainable amount.

Although the issue is not free from doubt, I find that the plaintiffs have an enforceable fee agreement with the Law Firm. Rejecting the plaintiffs' testimony would equate to a finding that the Law Firm agreed (as in *Scion Breckinridge*) to represent the

55

plaintiffs' *pro bono* absent indemnification from Sweports. That is implausible as to Dore, who was unaffiliated with the Law Firm. The arrangement could be plausible for O'Rourke and Moody if they were the only partners in their firm, because they would internalize the economic effect in either case. It is less plausible when there are two other partners in the Law Firm. O'Rourke appears to be *primus inter pares* at the Law Firm, but the evidence does not support a finding that he and Moody will be able to escape the receivable entirely. Perhaps they will find ways to true things up with their partners internally through credits on other matters, but some form of payment will be due.

Given this record, the plaintiffs have an enforceable oral contract with the Law Firm. They incurred the amounts for which they seek indemnification in the sense that the Law Firm has a legal right to recover from the plaintiffs the amounts that the plaintiffs sought in this proceeding to the extent Sweports does not pay them. This decision has held that Sweports has no obligation to pay a substantial portion of the amounts that the plaintiffs originally sought. The plaintiffs have a legal obligation to pay those amounts to the Law Firm, just as they would be obligated to pay the amounts that Sweports must indemnify. The fact that the Law Firm has fronted the amounts to date does not prevent the plaintiffs from seeking to recover from Sweports.[9]

---

[9] *See Sodano v. Am. Stock Exch. LLC*, 2008 WL 2738583, at *16 (Del. Ch. July 15, 2008) (Strine, V.C.) ("[A] company's advancement or ultimate indemnification obligation is not reduced merely because a volunteer advances or indemnifies the relevant expenses."), *aff'd sub nom.*, *Am. Stock Exch. LLC v. Fin. Indus. Regulatory Auth., Inc.*, 970 A.2d 256 (Del. 2009) (TABLE); *Schoon*, 948 A.2d at 1175–76 (same).

## I. Enforcement Expenses For This Proceeding

The final issue is enforcement expenses for this proceeding. When a corporation has provided individuals with mandatory indemnification to the fullest extent of the law, that right includes indemnification for expenses incurred enforcing the indemnification right. *Cochran*, 809 A.2d at 561. The award "must be proportionate to the success . . . achieved." *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 178, 179 (Del. Ch. 2003) (Strine, V.C.).

Because of the steps that O'Rourke and Moody took to alter their time entries and manufacture new ones, I would have considered denying any enforcement expenses on the grounds of bad faith or unclean hands. *See Nakahara v. NS 1991 Am. Tr.*, 739 A.2d 770, 792 (Del. Ch. 1998). But Sweports did not make that argument.

One method of determining proportionality is to examine the degree to which the individuals recovered the expenses they sought in the underlying action. Although other methods for assessing proportionality might be warranted in a different case, this decision awards the plaintiffs a similar percentage of the fees and expenses they incurred pursuing this litigation.

The plaintiffs sought a total of $1,258,821.09 for the underlying proceeding. This decision has determined that the plaintiffs are only entitled to indemnification for a total of $241,492.50, which represents 19.18% of the total originally sought. The plaintiffs sought a total of $397,700.69 in expenses for this proceeding. To simplify matters and avoid an implication of false precision, this decision holds that they are entitled to 20% of that amount, or $79,540.14.

This amount does not cover expenses that the plaintiffs incurred after trial. The plaintiffs are entitled to a comparable percentage of their post-trial enforcement expenses. If the parties cannot agree on an amount, the plaintiffs' counsel shall file a Rule 88 affidavit.

## III. CONCLUSION

The plaintiffs are entitled to indemnification in the amount of $241,492.50 for the underlying proceedings. They are entitled to indemnification of $79,540.14 for pursuing this action through post-trial argument.